¶ 18.
Robinson, J.,
dissenting. The portion of applicants’ land that is located within the residential high density (RH) zoning district is subject to all of the requirements of the RH district with respect to, among other things, building height, dimensional *461 standards, and density. Yet the majority holds that the tract is subject to a more onerous setback requirement on its northern boundary than any other property in the City of Burlington located in the RH district. The rationale underlying the majority’s analysis does not support its conclusion, and its ruling undermines important zoning policies, is untethered from the letter and goals of the applicable zoning ordinances, and leads to unpredictable outcomes. For these reasons, I respectfully dissent.
¶ 19. I note at the outset that I fully agree with the majority’s rejection of the City’s argument that the ordinance requires a setback within applicants’ merged lot, between the portion located in the downtown transition (DT) district and the portion in the RH district. Ante, ¶¶ 5-9. That position does not jibe with the language and purpose of the ordinance, and makes little sense for the reasons identified by the majority. But I cannot join the conclusion that because the setback called for in the applicable ordinance does not apply here, a new setback between two properties within the RH district is required.
¶ 20. The majority reasons that “the purpose of the fifteen-foot ‘Residential District Setback’ in [City of Burlington Comprehensive Development Ordinance § 4.4.1(d)(6) (2012) [hereinafter CDO]] logically must be to provide a buffer between the denser downtown development and the less-dense residential communities.” Ante, ¶ 10.
¶ 21. If the merger of applicants’ lots meant that the RH portion of applicants’ lot was now subject to the zoning requirements of the DT district with respect to matters such as building heights, dimensional standards, and density, then the majority’s reasoning would make a lot of sense. Consistent with the City’s zoning ordinances, the neighbor to the north of applicants’ newly-merged lot should not suddenly find itself pressed up against a DT-district-compliant structure without some sort of buffer.
¶ 22. But the RH portion of applicants’ lot is not subject to the requirements of the DT district by virtue of the merger of applicants’ lots. In 2008, the City amended its ordinances to eliminate rules providing that a split-lot owner gets the benefit of the more permissive district’s restrictions with respect to the entire lot if more than fifty percent of the land area of the parcel lies within the less-restrictive zone. There is nothing in the revised ordinance that suggests that properties straddling district lines are exempt from the requirements applicable in each respective *462 district regarding the property in that district. Nor is there any support for the notion that the creation of a split lot effects a relocation of the district boundary. The district boundaries are to be interpreted with reference to the property lines or other applicable references as they existed at the time of passage of the ordinance, CDO § 4.1.4, and the ordinance clearly provides that district boundaries can only be amended by the administrative officer in accordance with actions of the city council. Id. § 4.1.3. For these reasons, the portion of applicants’ lot previously located in the RH district is still located in the RH district, and is still subject to the RH district zoning requirements. As applicants acknowledge, to the extent that their proposed structure sits on the portion of their lot that lies within the RH district, it must comply with the RH district zoning requirements.
¶ 23. Because the RH portion of applicants’ lot is subject to the RH district zoning requirements, the notion that a buffer is required to insulate the neighbor to the north in the RH district from the denser downtown development of the DT district[4] does not make sense. Because the neighbor to the north adjoins property that is within the RH district, and is subject to the residential-district zoning requirements of that district, there is no greater need for a buffer between applicants’ property and the neighbor to the north than between any other two properties within the RH district. The majority’s rationale does not support its conclusion.
¶ 24. Moreover, the majority’s approach undermines an important policy goal of the ordinance — to provide uniform requirements for structures within each district. The ordinance specifically identifies among its purposes “[pjroviding uniform provisions for each class of uses or structures within each district” and “[rjequiring that every parcel of land and every structure in the city ... be subject to the regulations, restrictions, and require *463 ments specified for the district in which it is located.” CDO § 4.0(b), (c). Yet, as noted above, the majority’s approach singles out one area within the RH district — the northern portion of applicants’ merged lot — and applies a setback requirement that is more restrictive of the property owner’s ability to develop that property than the requirements applicable to any other property within the RH district. And it subjects applicants’ property to more onerous rules than any other property in the RH district without an overriding rationale that advances other goals of the ordinance. This approach is not consistent with the stated purposes of the zoning ordinance. See In re Tyler Self-Storage Unit Permits, 2011 VT 66, ¶ 13, 190 Vt. 132, 27 A.3d 1071 (“We examine not only the plain language of a zoning ordinance, but also the whole of the ordinance ... in order to try to give effect to every part, and will adopt an interpretation that implements the legislative purpose. . . . The legislative intent is most truly derived from a consideration of not only the particular statutory language, but from the entire enactment, its reason, purpose and consequences.” (quotations omitted)).
¶ 25. If the plain language of the ordinance supported the majority’s approach, I might be persuaded. See In re Howard Ctr. Renovation, Permit, 2014 VT 60, ¶ 9, 196 Vt. 542, 99 A.3d 1013 (“Our paramount goal in construing a zoning ordinance, like any statute, is to give effect to the legislative intent. Thus, we construe an ordinance’s words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance.” (quotations omitted)). But the notion that the ordinance requires a fifteen-foot setback between land situated in the RH district and another property in that district is untethered from the ordinance. The ordinance applicable to property 'within the DT district provides: “Structures shall be setback a minimum of 15-feet from any property line that abuts a residential zoning district.” CDO § 4.4.1(d)(6). The majority’s approach applies this restriction to property that is located in the RH district, and requires a setback from a property line that does not “abut” a residential zoning district, but rather is fully within it. Absent compelling evidence that our construction is consistent with the intent of an ordinance, we should not stray this far from its plain language.
¶ 26. Underlying the majority’s analysis seems to be the sense that the ordinance contemplates an unbroken “buffer” between the *464 boundaries of the DT and RH districts, enforced by a fifteen-foot undeveloped swath of land. If this buffer is not required smack down the middle of applicants’ merged lot, it must be required somewhere, and the boundary between applicants’ lot and the neighbor to the north seems like the most appropriate place to put it. But the sense that there has to be a fifteen-foot swath somewhere reflects an assumption that is not supported by the language and purposes of the ordinance, nor by the record. Having rightly concluded that, by its plain terms and consistent with its intent, the setback ordinance does not require a fifteen-foot swath down the middle of applicants’ merged lot, the majority did not have to search for another place to require a fifteen-foot buffer. Because the property in the RH district that would have benefited from the buffer was merged with the property in the DT district on which the buffer would have been required, the goals of the buffer are satisfied. It does not need to be relocated somewhere else.
¶ 27. And the logic of the majority’s approach is not entirely clear. Why not relocate the buffer to the south end of the merged parcel, so that a fifteen-foot buffer was required between the adjoining property within the DT district to the south, and the portion of applicants’ merged lot that was within the DT district?[5] If applicants acquire the lot immediately north of the merged lots, and merge that lot into the existing ones, does the floating fifteen-foot undeveloped swath move to the next lot north? Does it keep floating as more lots are merged? The majority asserts that its holding is limited to the facts of this case, but its rationale offers no clear framework for answering these questions.
¶ 28. For these reasons, I dissent. I would hold that all of the requirements of the RH district, including setback requirements, apply to the portion of applicants’ lot within that district, all of the requirements of the DT district apply to the portion of applicants’ lot within that district, and the residential district setback applicable in the DT district does not by its own terms or goals apply in this case.

 The ordinance provides that the RH district “is intended primarily for high density attached multi-family residential development. Development is intended to be intense with high lot coverage, large buildings, and buildings placed close together. Parking is intended to be hidden either behind or underneath structures.” CDO § 4.4.5(a)(5). The DT district is intended to serve as a gateway and a transition between the downtown district — the primary urban center of Burlington — and the nearby residential district. My analysis does not turn on this fact, but it’s important to note the contrast between the character of these two districts in terms of the primary factor cited by the majority — density — is modest.

 I realize that in this case the southern portion of the merged lot is bounded on the south by Pearl Street. My point is that the logic of the majority’s approach — looking for a different place to situate a fifteen-foot buffer when a newly merged lot straddles the DT and RH districts — could as easily lead to relocating the “buffer” to the other end of an affected property.